# United States Court of Appeals
## For the First Circuit

---

No. 20-2129

UNITED STATES,

Appellee,

v.

ALEXANDRIA ANDINO-RODRÍGUEZ,

Defendant, Appellant.

---

No. 20-2183

UNITED STATES,

Appellee,

v.

KATERIN MARTÍNEZ-ALBERTO,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

---

Before

Kayatta, Lynch, and Thompson,
Circuit Judges.

---

Juan F. Matos-De Juan for appellant Andino-Rodríguez.
Tina Schneider for appellant Martínez-Alberto.

Jonathan E. Jacobson, with whom W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Julia M. Meconiates, Assistant United States Attorney, were on brief, for appellee.

––––––––––––––––––

August 21, 2023

––––––––––––––––––

**THOMPSON, <u>Circuit Judge</u>**.  Experience has taught us drugs are trafficked in many ways, with drug runners using assorted transportation methods and various concealment techniques to move their narcotics.  Today's drug-trafficking case comes by sea, via the Black Wolfpack, a boat that ferried cocaine smugglers and their product between Caribbean islands.  Specifically, the players in this scheme undertook voyages from Puerto Rico to St. Thomas to acquire and package bricks of cocaine for transport back to Puerto Rico, where they would then receive compensation for their efforts.  That came to an end in January 2018, though, when federal agents intercepted the Black Wolfpack off the coast of St. Thomas and, with it, four of the trafficking enterprise's participants.

What resulted was a multi-defendant indictment charging drug conspiracy crimes.  While four co-conspirators entered guilty pleas, our appellants -- co-defendants Katerin Martínez-Alberto ("Martínez") and Alexandria Andino-Rodríguez ("Andino") -- each exercised their trial rights.  Following a joint eight-day jury trial, both were convicted for their roles in the trafficking venture.

Now, in these consolidated appeals, Martínez and Andino, alleging trial and sentencing errors, ask us to reverse what happened below.  But for reasons we'll explain, we affirm in toto.

**BACKGROUND**

**Facts**

Drawing from the record to tell this tale -- and doing so in the light most favorable to the jury's verdict, see, e.g., United States v. Ciresi, 697 F.3d 19, 23 (1st Cir. 2012) (citing United States v. Mitchell, 596 F.3d 18, 20 n.1 (1st Cir. 2010)) -- we begin by laying out the facts of the drug-trafficking scheme in which our appellants were embroiled, providing a good bit of saga up front in order to facilitate the gentle reader's understanding of how this all transpired. We will fill in more detail later, when additional factual and procedural particulars become necessary to our analysis.

Back on January 27, 2018, in the Crown Bay Marina in St. Thomas, a Customs and Border Protection ("CBP") marine interdiction agent had eyes on the Black Wolfpack, a vessel suspected of trafficking drugs to and from Puerto Rico.[1] Walking towards the Black Wolfpack, carrying luggage, boxes, and a cooler, were two men and two women, later identified as Maximiliano Figueroa-Benjamín ("Maximiliano"), Emiliano Figueroa-Benjamín

---

[1] Information had been relayed to CBP by the FBI after it learned from a source of information that a vessel would soon depart Puerto Rico for St. Thomas, pick up cocaine there, then return with the kilos to Puerto Rico. As a result, the CBP agent was called into action "to be on the lookout" that day.

- 4 -

("Emiliano"),[2] Martínez, and Andino.   All aboard, the Black Wolfpack departed the St. Thomas marina towards Puerto Rico, but, about halfway through what became a hazardous return journey,[3] it was intercepted and escorted back to St. Thomas by law enforcement.

Over the course of their searches that day, federal agents seized from the Black Wolfpack several items, including the four individuals' identifications as well as their cell phones.[4] Also found and retrieved inside a hidden compartment were 55 bundles of what was believed (and subsequently confirmed) to be cocaine.   Two days later, agents further searched the Black Wolfpack, this time finding 56 bundles of suspected cocaine under a table bolted to the vessel's floor.[5] Among the 111 total bundles seized, there were various stickers and insignia affixed to the

---

[2] Given these first two co-defendants have the same last name, we use their first names to avoid confusion, no disrespect intended.

[3]  The weather that day wasn't exactly ideal for a leisure trip between the islands:  Agents testified the waves were between 10 and 15 feet high (some of the worst one agent had seen), forcing the experienced seafaring agents to debate the safety of pursuing the Black Wolfpack before ultimately deciding to give chase.

[4] Andino and Maximiliano consented to the searches of their phones.  Martínez did not, but after the seizure of her phone from the arrested Black Wolfpack, federal agents extracted the information used by the government in its prosecution case.  The record suggests warrants were obtained for the search of and extraction from each of the phones, but it is not crystal clear. Regardless, no one has challenged the propriety of the searches on appeal.

[5]  Of the various federal agencies involved, the FBI was designated the seizing agency.

bricks, including stickers with crowns and $100 bills on them. All told, the total weight of the 111 cocaine bricks was 132 kilograms, with a street value of $20k-22k per brick (for a grand total of more than $2 million in value).

To better understand the scope of what led to this moment at sea, let us travel back to 2017 to walk through what happened over the course of the charged conspiracy. Because while January 27, 2018 was the first time this group got caught, it was not their first rodeo.

We introduce you to two names, new to our recounting but central to the enterprise: Bernardo Coplin-Benjamín ("Coplin") and José Javier Resto-Miranda ("Resto").[6] It was Coplin who, around March of 2017, came up with the grand idea to buy a boat that would move drugs from St. Thomas to Puerto Rico, and in anticipation of that goal Coplin asked his friend and associate,

---

[6] With respect to Coplin, we note that he also was indicted, then pled guilty and was sentenced. In the wake of all that, he filed a timely appeal. See United States v. Coplin-Benjamin, No. 21-1737. To be clear: We discuss Coplin here based only on the evidence offered at the joint trial of Martínez and Andino, and we do so solely for the purpose of fleshing out the trafficking scheme as it relates to their involvement and issues raised by them in this appeal. We offer no take whatsoever on the facts or merits of Coplin's appeal.

As for Resto, the only co-conspirator to testify at Martínez and Andino's trial, he has an important role to play in our factual recitation, and he also figures prominently in one of the appellate issues we'll be chasing down in the pages to come.

Resto, for his help. In time, Coplin followed up and purchased a
boat: the Wasikoki.

In preparation to set sail on their trafficking venture,
Coplin and Resto did some reconnaissance. To get a read on the
planned route, length of the trip, and fuel costs, Coplin asked
another individual (whose identity is irrelevant here) to captain
a test run. Aboard that April 2017 Wasikoki trial outing were
Coplin, Andino (a close friend of Resto, who brought her into the
enterprise), and Maximiliano.

Thereafter, with the route settled, a basic plan was
hatched: Resto, Maximiliano, Martínez (another of Resto's friends
and recruits), and Andino would make a trip on the Wasikoki to St.
Thomas, with the women playing the roles of "fillers" to erect a
facade of two couples out on a leisure ride (Resto told them they'd
be paid $3,000 apiece for their participation); the group would
pick up the cocaine; and they'd return to Puerto Rico with it.
Come May 2017, they headed out to sea. Upon their arrival in St.
Thomas, Maximiliano picked up the cocaine from his contact there,
and he and Resto stashed the vacuum-sealed and greased bundles in
a hidden compartment on the Wasikoki. But then they hit a snag:
The Wasikoki had technical problems. Resto (as captain on this
voyage) decided the journey would have to be abandoned -- as he
told his companions aboard the vessel, it wasn't worth the risk of
undertaking the drug run on the Wasikoki when she was struggling

with mechanical issues and might break down.  Resto gave the kilos to Maximiliano, who returned them to his contact.  Emptyhanded, the Wasikoki and its crew then made the return voyage back to Puerto Rico.

The Wasikoki's mechanical issues were persistent, as it turned out, so in May 2017, Resto helped Coplin acquire a new boat: the Black Wolfpack, which Resto registered in his name.

In late July or early August of 2017, Resto, Maximiliano, and Andino (no Martínez this time) climbed aboard the Black Wolfpack and made another trip to Crown Bay Marina in St. Thomas to pick up cocaine.  Once there, Maximiliano went to meet with the supplier while Resto and Andino went to an apartment on St. Thomas to help get the cocaine ready for its journey to Puerto Rico, including by putting the coke into packages, some of which had crowns on the seal.  More on this later.  For context, all the reader need file away for now is that Andino made another trip, then helped package the kilos for transport home to Puerto Rico, where, at Coplin's house, she received $7,000 for her efforts.  Also worth noting now, for purposes of explaining Resto's role in all of this, is that Resto got $35,000 and complained he "thought it should be more."

The Black Wolfpack set sail for St. Thomas yet again in September 2017, this time with Andino, Maximiliano, Resto, and his girlfriend (who is not a co-defendant here) aboard, and under the

pretext that they were bringing aid in the wake of Hurricane Irma. Andino again participated in preparing the cocaine for transportation, then got back aboard the Black Wolfpack to head back to Puerto Rico, where she, as before, was paid $7,000 for her efforts. Resto, again disappointed by his "unfair" payout ($20,000 this time), confronted Coplin, urging that he should be paid more as captain. Coplin's response was to tell Resto "to deal with it" -- "this [was] the way that it was going to be done." Displeased and feeling like the risk/benefit balance was not "a good deal" for him, Resto then "distanced" himself from the group.

A couple of months later, text messages between Martínez and Andino reflected an upcoming November 4, 2017 trip. Indeed, Crown Bay Marina paperwork bears Andino's registration of the Black Wolfpack on that same date. Further proof of that particular voyage -- telling photos. There's a November 4 selfie of Martínez and Andino that was found on Maximiliano's phone during the search following that January 27, 2018 seizure -- it shows the women aboard the Black Wolfpack with the cooler they used to transport the cocaine from its packaging site back to the vessel. And Maximiliano is in another picture from his phone -- he's steering the Black Wolfpack, and Martínez and Andino are standing in close proximity. Meanwhile, Martínez's phone contained a November 4 photo showing crown-sticker and $100-bill-sticker bundles.

And St. Thomas got another November 2017 visit from the Black Wolfpack, this time on the 17th.  Marina registration papers for that day once more show Andino's signature, and Maximiliano's phone has a November 19 photo showing him, Andino, Martínez, and another individual at the cocaine-packaging site (an apartment) with that telltale cooler used to move the kilos (as Resto attested at trial) behind them.

Fast forward to January 2018, back to the events we started with.  Now, Resto had not been participating in this drug-trafficking enterprise for a few months, but he was asked to join for that January 2018 trip.  He declined, instead going to Alaska, where he would renew his asbestos removal license (he'd worked in Alaska over the years, he explained at trial).  Resto later learned of his four associates getting busted when Coplin called him and broke the news that Martínez, Andino, Maximiliano, and Emiliano had been arrested in St. Thomas.[7]

### Procedural History

In the wake of the January 2018 seizures and arrests, a second superseding indictment ultimately issued charging Martínez, Andino, Maximiliano, and Emiliano, and later Coplin and Resto,

---

[7] A few weeks after that, Resto returned to Puerto Rico and met up with Andino, who was out on pretrial release, during which meeting she told Resto the January 2018 crew had actually noticed they were being followed as they left St. Thomas, and Andino had suggested they throw away their phones, but Maximiliano rejected that suggestion because his phone was new and had been pricey.

with conspiracy to possess with the intent to distribute a controlled substance in violation of 21 U.S.C. § 846 (Count One) and conspiracy to import controlled substances into the U.S. in violation of 21 U.S.C. § 963 (Count Two) (said conduct beginning on a date unknown, but not later than 2017, and continuing until a date unknown, but not earlier than January 27, 2018).

Over time, each of Martínez and Andino's co-defendants entered guilty pleas.[8]  For their part, Martínez and Andino, as we noted earlier, proceeded jointly to trial, at which both defendants were found guilty[9] and later sentenced (concurrent 120-month terms of imprisonment, to be followed by concurrent five-year terms of supervised release, for each defendant).  Appellants timely and separately appealed, and here we are.

---

[8] The important plea to note right off the bat is Resto's. As relevant to this appeal, Resto's plea included:  him copping to conspiring with his co-defendants to distribute between 15 and 50 kilos of cocaine; his understanding that his sentencing range would be no less than ten years' imprisonment and at least five years' supervised release; and his agreement that the parties would recommend that minimum term to the sentencing court.  And Resto signed a cooperation agreement, too, in which he signaled, among other things, his willingness to provide truthful testimony at a future trial.

[9] The government met its case burden using:  the agents that intercepted and searched the Black Wolfpack; the agents who extracted the data from the defendants' cell phones; the forensic chemist who tested the seized cocaine; and a cooperating Resto, who testified pursuant to a cooperation agreement.  It also adduced photos and video evidence of the searches, the cocaine, and business records from the marina in St. Thomas, along with the relevant photos, text exchanges, and voice messages retrieved from the defendants' phones.

## DISCUSSION

The appellate contentions pressed by Martínez and Andino are discrete ones with no overlap as between each appellant. Martínez presses three challenges on appeal, each arising from a different moment during trial.[10]  In sum, she argues the district court committed errors (1) regarding Resto's trial testimony, (2) in making an evidentiary ruling, and (3) when it delivered jury instructions.  As for Andino, she says the district court erred when it denied her the minor participant adjustment she sought. Proceeding chronologically, let's test the waters.

### Martínez

#### *Resto:  Recross-Examination and the Motion to Strike*

Martínez's first argument zeroes in on Resto, the co-conspirator turned cooperating witness, and a couple of aspects of the district court's handling of his testimony.  The thrust of her argument, as we understand it to be, is that two of the district

---

[10] Below, Martínez made a Rule 29 motion challenging the government's evidence as to her knowing participation in the conspiracy.  The district court denied it.  While Martínez's appellate papers at times suggest that the evidence as to her conspiracy participation and knowledge wasn't sufficient, we do not understand her to be advancing a sufficiency-of-the-evidence challenge here.  Nor did the government.  To the extent she may have intended to mount such a challenge before us, we deem it waived.  See, e.g., Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175-76 (1st Cir. 2011) (deeming waived arguments offered with no citations or analysis); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (urging that litigants are required to develop their own arguments rather than "leaving the court to do counsel's work").

court's rulings -- its denial of recross of Resto and, later, its grant of the government's motion to strike some of Resto's testimony -- denied her the opportunity to impeach Resto's testimony and credibility in violation of her Sixth Amendment Confrontation Clause rights. To navigate her claims, we first provide some preliminary guiding principles, then wade into the transcripts of the waning days of the trial to explicate the sequence of events and rulings.

It's axiomatic that "[t]he Confrontation Clause of the Sixth Amendment guarantees criminal defendants the right to cross-examine witnesses who testify against them." United States v. Maldonado-Peña, 4 F.4th 1, 31 (1st Cir. 2021) (quoting United States v. Casey, 825 F.3d 1, 23-24 (1st Cir. 2016)), cert. denied Rivera-Alejandro v. United States, 142 S. Ct. 729 (2021), and cert. denied Rivera-George v. United States, 142 S. Ct. 1184 (2022), and cert. denied Rivera-Alejandro v. United States, 142 S. Ct. 1185 (2022). It allows defendants to "test the believability of a witness and the truth of his testimony." Id. (quoting United States v. Rivera-Donate, 682 F.3d 120, 126 (1st Cir. 2012)). "This right is not without limits, however; the district court wields considerable discretion to impose 'reasonable limits' on cross-examination." Id. (quoting Casey, 825 F.3d at 24); see also United States v. Kenrick, 221 F.3d 19, 33 (1st Cir. 2000) (en banc) (acknowledging the district court's extensive discretion when it

comes to controlling recross-examination), abrogated on other grounds by Loughrin v. United States, 573 U.S. 351 (2014). Importantly, "[w]hen a witness's credibility is at issue, the trial court may limit cross-examination as long as the court allows sufficient leeway to establish a reasonably complete picture of the witness' veracity, bias, and motivation." Maldonado-Peña, 4 F.4th at 31 (quoting Rivera-Donate, 682 F.3d at 126). For our part, we employ a two-step analysis: We first "review de novo whether a defendant was afforded a reasonable opportunity to impeach a witness, and [second,] for abuse of discretion limitations the trial court imposed on that opportunity." Id. (quoting Casey, 825 F.3d at 24); see also United States v. Pérez-Ruiz, 353 F.3d 1, 11 (1st Cir. 2003) ("In the first instance, Confrontation Clause challenges are reviewed de novo in order to verify that the trial court afforded the defendant a reasonable opportunity to impeach adverse witnesses. When that constitutional threshold is crossed, we examine the trial court's restrictions on the manner and extent of cross-examination for abuse of discretion.").

Initial guidance in place, we turn back to our case to see how things played out below.

On trial days six and seven (of eight), defense counsel -- first for Andino, then for Martínez -- conducted their cross-examinations of Resto. As relevant here, both counsel probed

Resto's cooperation agreement.  Martínez's counsel went further and explored Resto's purchase and possession of a gun in Alaska, which he admitted to, as well as his drug-dealing business in Alaska.  He also acknowledged that his plea agreement did not include a charge of possession of a weapon in furtherance of drug trafficking, nor did his sentencing guidelines recommendation include any points provided for possession of a firearm.[11]  About the propriety of his gun ownership, Resto testified his having it was legal in Alaska, but Martínez's counsel countered by asking, "[I]sn't it true that even if you buy a weapon . . . you have to register the weapon with the police department closest to your home[?]"

Following cross-examination by both defense counsel, the government briefly redirected, and during the redirect, Resto testified there was no connection between his gun ownership and his selling drugs in Alaska.  Thereafter, the district court excused Resto from the stand.

Needing to take care of several procedural housekeeping matters, the court, outside the presence of the jury, held a sidebar at which Andino's attorney represented that he had intended to recross-examine Resto regarding aspects of his testimony

---

[11] The terms of Resto's plea agreement provided the agreement bound only "the United States Attorney's office for the District of Puerto Rico and the defendant."

concerning his cooperation with the government and benefits he might have derived from that cooperation. He made a particularized proffer indicating he would have recrossed on "three specific moments in which [Resto] was promised by the agents that he was going to get specific considerations": (1) the FBI's statements to Resto which showed they made promises to him including bail and staying in Alaska; (2) the timing of when Resto began to cooperate; and (3) Resto's misstatements about what he said during his FBI interview. Martínez's counsel, without elaboration, "join[ed] brother counsel's objection." The district court denied the request, indicating that all those proposed topics had already been covered (or should have been covered) during cross-examination.[12]

On the next and final day of the trial, the government, returning to the topic of Resto's cross-examination, moved to strike the testimony about Resto's Alaskan gun possession, argued that whether Resto had registered the gun was irrelevant to his credibility, and even if he may have run afoul of a registration requirement, he hadn't been convicted of any such violation. After

---

[12] No strictly new topics came up during redirect that would have, as we sometimes say, opened the door to new lines of inquiry Martínez's trial counsel couldn't have had an opportunity (or reason) to ask about up until that door was opened. See generally, e.g., United States v. Tetioukhine, 725 F.3d 1, 10 (1st Cir. 2013) (discussing what can suffice "to open the door to further cross-examination"). Martínez has not argued otherwise.

hearing from each side, the district court granted the motion on the grounds that Martínez's attorney, when asked, was unable to cite any firearm ownership law Resto had purportedly violated. The district court, finding that the gun-in-Alaska questioning could mislead the jury, instructed the jury to disregard all of it.

On appeal, Martínez's argument takes aim at these two events -- the denial of recross-examination and the grant of the motion to strike -- and argues the district court's striking of Resto's gun testimony concerning his possession of the gun while dealing cocaine, "exacerbated by the court's denial of [her] opportunity to recross him," had the effect of depriving her "of the constitutionally required threshold level of inquiry," robbing her of "sufficient leeway to establish a reasonably complete picture of the witness's veracity, bias, and motivation." More specifically, she argues, the gun evidence could have been used to show Resto's bias given that the government could have charged him, but, favorable to him, didn't (see supra note 8),[13] or could have enhanced his sentence, but, again favorable to him, didn't,

---

[13]  Martínez does not pursue her trial-stage theory based on Resto having committed a crime by failing to register his gun in Alaska.

based on firearm possession (see 18 U.S.C. § 924(c)),[14] thereby casting doubt on Resto's credibility.  As she puts it, "[Resto's] credibility was at the core of the government's case against Martínez," and the court's double-barreled rulings impinged upon her ability to attack that credibility.[15]  Our bottom line takeaway from her argument boils down to this:  Martínez asserts that being denied recross and then being unable to argue anything about the gun at all, because the little gun evidence there was had gotten stricken, impacted her ability to effectively attack Resto's credibility "by exploring the benefits he derived from his cooperation."

The government offers a fulsome retort to Martínez's arguments which we'll weave into our analysis as we go along.

We open by acknowledging our agreement with Martínez's top line assertion:  The opportunity to recross a witness can

---

[14] We note Resto was not charged as a felon in possession of a firearm, presumably because his presentence report reflects that he had no known criminal history.

[15] We pause to make an observation.  To the extent Martínez intends her arguments contesting the combination of rulings to be something akin to a violation of the cumulative error doctrine, see, e.g., United States v. Baptiste, 8 F.4th 30, 39 (1st Cir. 2021) ("The cumulative-error doctrine holds that errors not individually reversible can become so cumulatively."), at the end of our analysis of these claims, we find no error and as we've said before, "[b]ecause we find no merit to the individual claims, as a matter of course there can be no cumulative error," United States v. Bulger, 816 F.3d 137, 160 n.25 (1st Cir. 2016) (citing United States v. Brown, 669 F.3d 10, 28 (1st Cir. 2012)).

implicate the Confrontation Clause. See, e.g., Pérez-Ruiz, 353 F.3d at 10-11. And that's where we'll start our review, doing so with fresh eyes. Id. at 11 (arraying our court's review as starting with the de novo consideration of the confrontation-driven challenge, then, once "that constitutional threshold is crossed," moving to abuse-of-discretion scrutinization of the trial court's restrictions on cross).

*Reasonable Opportunity to Impeach*

Taking a look at the record, it clearly reflects, as the government contends, that the district court gave Martínez a reasonable opportunity to confront and impeach Resto.

As mentioned, cross-examination commenced on trial day six, a day after the government completed its direct (with the government briefly "reopen[ing]" direct to show a few pictures). And as far as cross-examinations go, it went smoothly, with the district court allowing nearly all lines of inquiry, many of which prompted responses from Resto that reasonably could tend to cast doubt on his credibility. For example, Resto agreed that he had repeatedly lied to federal agents -- even up to four days before the trial started -- and that he was never charged with a separate crime based on these lies. The jury learned through his testimony that it was only after his attorney advised him to stop lying that Resto fully began to cooperate. The cross also focused on Resto's signed cooperation agreement with the government and the benefits

that he derived from it, including the possibility of a reduced sentence.  Indeed, even in the wake of some sustained objections over the course of the two-day cross-examination, the record is clear "that the defense got its main point[s] across." Maldonado-Peña, 4 F.4th at 34-35; Pérez-Ruiz, 353 F.3d at 11 (finding it "crystal clear" that an appellant had "ample opportunity to confront [the witness's] testimony" when the district court gave defense counsel a recess after the direct had concluded and "did nothing to limit the length of [the ensuing] (and skillfully conducted) cross-examination"); see also Cruz-Rivera, 14 F.4th at 52 (spying no confrontation issue when defense counsel had explored the witness's bias through a cooperation agreement and reduced sentence -- and leaned on the same during closing argument).

*Recross-Examination Request*

What remains, then, at step two, is for us to resolve whether the denial of recross-examination of Resto constituted an abuse of discretion.  See Maldonado-Peña, 4 F.4th at 31; Casey, 825 F.3d at 24.  "The abuse-of-discretion standard is not 'appellant-friendly.'"  United States v. Marino, 833 F.3d 1, 7 (1st Cir. 2016).  We have said that "[t]he touchstone of abuse of discretion review . . . is reasonableness." Id. at 10 (quoting United States v. Vargas-Dávila, 649 F.3d 129, 130 (1st Cir. 2011)). This means that we will affirm only if "no reasonable person could

agree with the ruling." United States v. Rivera-Carrasquillo, 933 F.3d 33, 44 (1st Cir. 2019).

The short of it is that contrary to Martínez's claim, and as the government contends, the district court's ruling was not an abuse of its extensive discretion.  Recall first that it was Andino's attorney, not Martínez's, who put any meat on the bones of the objection he made to the court's recross ruling.  And here, Martínez does not even mention that three-point proffer Andino's attorney made to the court.  Instead, Martínez's brief shifts back to talking about the exclusion of the gun testimony and how the earlier denial of recross prevented defense counsel from probing Resto's disclaimer of any connection between the gun and his drug dealing in Alaska.[16]

But not only is this rear-view-mirror approach untenable in light of basic preservation principles, crucially, that's not how our review of her claim works.  Our examination of her allegations of error focuses on the district court judge's reasonableness assessment of the evidentiary ruling at the time the decision was made.  See United States v. Brown, 669 F.3d 10,

---

[16] We understand her argument on why she believes the court erred to go like this -- now knowing the district court would later strike Resto's gun testimony, she would have us consider that future ruling alongside the recross ruling to strengthen her contention that the court abused its discretion when it denied her the opportunity to recross.  Creative -- give her that.  Yet she cites nothing to support such a proposition.

22 (1st Cir. 2012) (instructing that "[i]mplicit in [the abuse of discretion] standard is the requirement that we not indulge in review by hindsight but consider what evidence was before the trial judge at the time").

Accordingly, on these facts, we cannot characterize the district court's denial of recross as an abuse of discretion.  See, e.g., Maldonado-Peña, 4 F.4th at 31; Kenrick, 221 F.3d at 33.

*Strike Motion*

We turn now to the motion to strike, which generally gets abuse-of-discretion review.[17]  See, e.g., United States v. Sabetta, 373 F.3d 75, 82 (1st Cir. 2004); United States v. Houlihan, 92 F.3d 1271, 1297 (1st Cir. 1996).

Think back to the basic progression that led to the motion to strike:  defense counsel suggested during cross that Resto had broken an Alaska law by possessing a gun and failing to register it; the motion to strike was filed a day later; when asked, Martínez's counsel could not provide the court with the Alaska law Resto supposedly broke.  In the exchanges that followed, the court, Martínez's attorney, and the government debated whether the gun testimony should be stricken, with Martínez's counsel

---

[17] Strictly speaking, Martínez never argues that the grant of the motion was an abuse of discretion, instead specifically stating that the ruling as it related to the misleading gun-registration-law testimony was not something she was actually challenging on appeal.  But this, we note, was the basis for the motion to strike and its eventual granting.

urging that Resto's apparent belief that he should have registered the gun goes to credibility.  The exchange also touched on the point that, according to the defense, Resto derived a benefit from his cooperation because he wasn't charged under § 924(c) as possessing a firearm in furtherance of drug trafficking.[18]  For example, in response to Martínez's counsel's assertion that "the drugs were drugs that were sent from Puerto Rico" to Alaska, the court replied, "His testimony was that he had that gun because of his business of sending drugs to Alaska and selling them, but it has nothing to do with transporting drugs from St. Thomas to Puerto Rico."  Counsel said, "That's a classic 924(c), possession of a firearm in furtherance of a drug trafficking crime," and the court responded that it had "nothing to do with this case," that "he has to have actively employed the firearm in furtherance of this drug crime."

The government, for its part, maintained that there was "zero connection" between Resto's gun possession and the facts of the instant case on trial, and the government "looked into the possibility of a 924(c) and determined [it] was an unprovable charge" because "there was no direct linkage to drug trafficking,"

_____

[18] For inquiring minds, the relevant portion of § 924(c) here lays out the penalties for "any person who, during and in relation to any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm."  18 U.S.C. § 924(c)(1)(A).

so Resto wasn't "obtaining a benefit by [the government] not
charging him with 924(c)."

Trying to pin it all down, the court squarely asked
Martínez's counsel, "Whether or not the [g]overnment brought a
924(c), how does that go to [Resto's] credibility?" In response,
Martínez's counsel revisited Resto's testimony regarding Alaska's
law about purchasing and registering guns, having previously asked
Resto, "And isn't it true that . . . you have to register the
weapon . . .?" and Resto answered, "That is correct." The district
court said, "[B]ut that's beside the point." Martínez's counsel
replied, "But that goes to his credibility. He says that he knows
the law." Said the district court in response: "But that is not
the law. . . . I don't care if the witness says that it is. The
witness can say that opening that door is against the law, and it
isn't. I am going to strike the testimony." And strike it he
did, saying the cross-examination concerning the gun had been
improperly misleading.

Martínez's point here, as she frames it, continues her
central thesis that striking the gun testimony had the effect of
denying her the opportunity to impeach Resto, in a constitutional
sense, and to challenge his credibility.

We take her argument to be either that Resto's shipping
cocaine to himself from Puerto Rico to Alaska was part of the
Puerto Rico conspiracy or that it was a separate but supportably

chargeable § 924(c) crime to possess the gun in furtherance of the
Alaskan drug trafficking (perhaps it's both). Thus, she again
urges that Resto's gun possession while dealing drugs and lack of
consequences for it, coupled with his cooperation, could have been
used to establish bias for impeachment purposes. Further, she
says, granting the motion to strike "cannot be deemed harmless"
because Resto was basically the star witness and the case hinged
on his credibility. Regardless of which § 924(c) angle is the
primary play here, and assuming her argument is preserved,[19] we
conclude, contrary to Martínez's assertion, that any error was
harmless.[20]

---

[19] Martínez's counsel's answer to the district court's
§ 924(c) question did not directly posit any analysis of how such
a charge not being brought impacts Resto's credibility, but,
because it makes no difference to our outcome and we think enough
lies latent in the record exchanges to give texture to the
argument, we will bypass waiver.

[20] Our harmlessness inquiry can go one of two ways, with us
inquiring whether: (1) any error was harmless beyond a reasonable
doubt, see United States v. George, 761 F.3d 42, 56 (1st Cir. 2014)
(sidestepping whether an evidentiary ruling offended an
appellant's confrontation rights "because even if an error
occurred (something we do not decide), that error was harmless
beyond a reasonable doubt" (citing United States v. Earle, 488
F.3d 537, 542 (1st Cir. 2007) (instructing that "[i]f a
constitutional error has occurred, we must order a new trial unless
the government has shown that any error was 'harmless' beyond a
reasonable doubt"))); or (2) any error was harmless in that it did
not affect Martínez's substantial rights, see Fed. R. Civ. P. 61
("At every stage of the proceeding, the court must disregard all
errors and defects that do not affect any party's substantial
rights."); see also Tersigni v. Wyeth, 817 F.3d 364, 369 (1st Cir.
2016) ("We may affirm in spite of an erroneous evidentiary ruling
if the error was harmless, meaning that 'it is highly probable

"Harmlessness turns on things like the importance of the testimony to the case, the cumulativeness of the testimony, the presence or absence of other evidence corroborating or contradicting the testimony, the extent of permitted cross-examination, and the overall strength of the government's case." George, 761 F.3d at 56 (citing Earle, 488 F.3d at 546). And "[w]e will affirm a conviction if the 'contested . . . statements . . . were at best cumulative of other compelling proof that [the defendant] committed the charged [crime].'" Earle, 488 F.3d at 546 (quoting United States v. Bartelho, 129 F.3d 663, 670 (1st Cir. 1997)).

Here, our review of the above-described list of harmlessness considerations prompts our conclusion that any error regarding Martínez's ability to probe Resto's credibility was indeed harmless. As the government points out, even without Resto's gun testimony in the evidentiary mix, Martínez had, as we've already described, plenty of tools available to her to impeach Resto's credibility -- her counsel was still able to use

---

that the error did not affect the outcome of the case.'" (quoting McDonough v. City of Quincy, 452 F.3d 8, 19-20 (1st Cir. 2006))).

While we grant (and have examined how) a recross issue does tap into constitutional confrontation issues, it is not clear (and Martínez does not say) why the motion to strike necessarily follows suit. Because the government carries the burden here, see Earle, 488 F.3d at 542, and because we would find harmlessness under either approach, we follow the government's lead and apply the "harmless beyond a reasonable doubt" lens.

the defense's effective cross-examinations during closing arguments, hammering home for the jury's benefit Resto's potential bias, motives, and truthfulness issues on points apart from the gun testimony.  For example, the jury heard Resto readily cop to wanting the best possible deals, and cooperation was one way to get a better sentence.  And another benefit of Resto's cooperation was the drug quantity stipulation he secured -- 15 to 50 kilos of cocaine as opposed to the significantly higher quantity he actually trafficked based on the evidence the jury heard.  His pattern of lying to agents (but not being charged for doing so) and minimizing his involvement in the trafficking scheme was likewise probed during Resto's testimony, then used during closing arguments.  Also during closings, defense counsel was able to highlight Resto's plea and cooperation agreements for the jury and counseled the jury to "consider . . . immensely" how much to trust Resto based on his testimony because his plea deal meant that he was on "un dedo pillao" (a short leash) with the government.

Aside from this effective dissection of Resto's credibility, the record reflects that the jury heard and saw ample evidence establishing Martínez's knowing involvement in the drug-smuggling enterprise -- and corroborating Resto's telling of the tale, to boot.  Consider, for example (this list of evidence is non-exhaustive):

- The day the 28-foot Black Wolfpack (with 111 kilos stashed on it) was intercepted at sea, Martínez was aboard;

- The evidence extracted from her cell phone included text messages from Martínez saying she was "working" and "rich" during the January 2018 trip to St. Thomas;

- November 3, 2017 text messages between Martínez and Andino showed Martínez responding to Andino's "[w]e're leaving tomorrow early" message with "[o]kay.  We're ready";

- Then, Martínez's cell phone took a November 4, 2017 picture of cocaine bricks -- the same day Andino registered the Black Wolfpack at the marina in St. Thomas; and

- Martínez appears in a November 19, 2017 photograph at the St. Thomas apartment where the cocaine had been packaged.

As the government argued to the jury in closing, "[Y]ou don't need Mr. Resto to tell you the story, the phones an[d] the documents tell you the story already."

Taking everything into account, in view of our case law's harmlessness considerations (like strength of the government's case, corroborative or contradictory evidence, cumulativeness, the extent of permitted cross-examination), and even if Martínez's motion-to-strike arguments have some merit, on this record, any error in granting the motion was harmless beyond a reasonable doubt. See George, 761 F.3d at 56; Earle, 488 F.3d at 542.

### *The Foot*

On the heels of her Resto-based asseverations comes
Martínez's argument that the district court committed error by
denying her request to (literally) put her foot in evidence, i.e.,
showing it to the jury so, as she tells it, the jury could compare
that evidence to the government's photographic evidence.  As the
record and resulting appellate arguments bear out, this request
produced a somewhat distinctive evidentiary situation.  We begin
again with the specifics of what happened below.

Journey back with us to the close of trial proceedings,
to when, before bringing the jury in for final instructions, the
district court asked defense counsel whether either of the
defendants would testify.  Martínez and Andino each said no.  And
the record reflects the defense had no witnesses it wished to call,
either.  But counsel for Martínez stated he did want to present
"one piece of evidence":  an in-court exhibition of Martínez's
foot.  The idea was for the jury to compare her foot to (what
Martínez says is) a foot that appears in the government's Exhibit
88.[21] [22]  The district court hesitated, querying how anyone would

---

[21] Exhibit 88 was a photograph extracted from Martínez's phone
depicting cocaine bundles with crown stickers and $100-bill
stickers affixed to them.  The photograph was taken on November 4,
2017.  On the bottom right side of the photograph, there is a dark
and blurry shape.  According to Martínez, that shape is a foot.

[22] This, we gather from the record exchanges, was the basic
gist of the proffer -- the in-court foot display, as direct
evidence, would prompt a comparison to Exhibit 88 that would rebut

"know it's her foot" in the photo and why this should be probed
outside of closing arguments, then reasoning Martínez's counsel
couldn't argue Exhibit 88 did not depict Martínez's foot unless
she testified about it.

Martínez's counsel tried to clarify by stressing

> all we are going to show the jury is Ms. Martínez-
> Alberto's foot. I'm going to request that a screen shot
> be taken, and that be Defense Exhibit 2, and that is all
> that we are planning on doing. We're not going to ask
> any questions, we're not making any statements, that is
> all that we're going to do in this case, Your Honor.

The district court's response was to say Martínez would need to
testify as to whether the exhibit depicts her foot. And when in
response Martínez's counsel asked if he could ask his client one
question -- "Is the foot that appears on Exhibit 88 your
foot?" -- the district court again reasoned that Martínez couldn't

---

what Martínez says was the government's argument that it is her
foot in Exhibit 88 and is evidence of her presence and knowledge
while aboard the Black Wolfpack. (Our review finds no basis for
the assertion that the government advanced such an Exhibit 88
argument, as we'll soon get to.) This proffer could have been
cleaner, but for purposes of our review, we need not grapple with
it. See Fed. R. Evid. 103(a)(2); see also Kelley v. Airborne
Freight Corp., 140 F.3d 335, 347 (1st Cir. 1998) (cautioning that
a court cannot "assess the importance of [] excluded evidence,"
absent compliance with Fed. R. Evid. 103(a)(2), when the proponent
of the evidence "[a]t no time . . . ma[d]e an offer of proof that
described the basic contours of the evidence [it] planned to
introduce"); Earle v. Benoit, 850 F.2d 836, 847 (1st Cir. 1988)
(declining to review a claim when the proponent of the evidence
never made an offer of proof describing the substance of the
proposed evidence, reasoning that "the offer of proof device
exists" for instances in which "a court refuses to receive evidence
and yet the same is needed to elucidate [a] proponent's claim for
admissibility, that the offer of proof device exists").

just show her foot to the jury; she'd need to testify, and she
could be subject to cross-examination if she did. And so, counsel
for Martínez said, "We have no evidence."[23]

Before us, Martínez says it was error for the district
court to deny her the opportunity to show her foot to the jurors.
Specifically, she urges it was incorrect to conclude that Martínez
would open herself up to cross-examination if she showed her foot
since doing so isn't testimonial -- and this error was not
harmless, she says, in that "[t]he evidence of Martínez's knowledge
of the conspiracy was not overwhelming," "[t]he photograph showing
the foot next to the bricks of cocaine was the most compelling
evidence of knowledge," and the government "extensively relied
upon it" to argue she knew about and was involved in the
conspiracy.

The government parries by offering a variety of reasons
why the district court was right to reject Martínez's request.
For instance, the government posits that Martínez failed to lay

---

[23] The district court pointed out the possible risk of Martínez
taking the stand to testify about Exhibit 88 and her foot in that
it might open her up to cross-examination on topics beyond "the
foot." See, e.g., Johnson v. United States, 318 U.S. 189, 195
(1943) (explaining that "[t]he case of an accused who voluntarily
takes the stand and the case of an accused who refrains from
testifying are of course vastly different" -- a "voluntary offer
of testimony upon any fact is a waiver as to all other relevant
facts, because of the necessary connection between all" (quoting
8 Wigmore, Evidence § 2276(2) (3d ed. 1940))). We note this, but
need not opine on it given our outcome.

any foundation for the evidence (her foot), and that because of this failure, it would render this evidentiary offer irrelevant. Moreover, according to the government, Martínez's characterization of Exhibit 88 and how the government used it at trial is off. Contrary to her insistence otherwise, says the government, that photo wasn't used to identify her foot and thus prove her knowledge of the conspiracy or her presence on the Black Wolfpack (whether by the purported foot itself or its proximity to the cocaine or, perhaps, the suggestion that she was the one who took the photo); rather, Exhibit 88 was used to show that Martínez's phone took a November 4, 2017 photo that showed logos on cocaine bundles, and those matched later images of similarly packaged and stickered cocaine bundles that were seized from the Black Wolfpack in January 2018.

We will review for abuse of discretion the foot-as-evidence issue.[24] See, e.g., United States v. Vázquez-Soto, 939 F.3d 365, 373 (1st Cir. 2019); United States v. Zaccaria, 240 F.3d 75, 78 (1st Cir. 2001) (stating abuse-of-discretion review applies to district court rulings admitting or excluding evidence and, in

---

[24] Our review of the record suggests Martínez did not lodge an objection to the court's ruling, but it is not clear. So we stick with abuse-of-discretion review for this argument. See, e.g., United States v. Rosado-Pérez, 605 F.3d 48, 54 & n.2 (1st Cir. 2010) (opting to conduct abuse-of-discretion review even when the appellants "did not always clearly object" and hadn't "preserved every concern they raise[d] on appeal").

so doing, noting that "[e]very trial presents a blend of idiosyncratic circumstances," so "presiding judges must be afforded some leeway in making evidentiary rulings"). And from our vantage point, this issue's resolution turns on the fundamentals of introducing evidence. Martínez's counsel ran afoul of those fundamentals relative to the proposed display of his client's foot in a way that undercuts her argument on appeal: the failure to proffer a proper evidentiary foundation.

"District courts 'have wide discretion in deciding whether an adequate foundation has been laid for the admission of evidence.'" United States v. Velazquez-Fontanez, 6 F.4th 205, 221 (1st Cir.) (quoting Veranda Beach Club Ltd. P'ship v. W. Sur. Co., 936 F.2d 1364, 1371 (1st Cir. 1991)), cert. denied, 142 S. Ct. 500 (2021), and cert. denied sub nom. Resto-Figueroa v. United States, 142 S. Ct. 1164 (2022); see also Gomez v. Rivera Rodríguez, 344 F.3d 103, 117 (1st Cir. 2003) (instructing that "the determination of whether a party has built a proper foundation is left principally to the sound discretion of the presider").[25]

---

[25] This is a good moment to revisit Martínez's depiction of the district court's ruling as being based on the foot-display as testimonial and thus triggering cross-examination, very cause-and-effect style. Certainly, the record reflects some debate about whether Martínez would testify and whether she'd then be subject to cross as a result. But the record also can be fairly read to reflect the district court's more threshold confusion and concern about the proposed evidence having no foundation, nothing to actually get it into evidence -- unless, for example, Martínez testified about it. Indeed, on balance, the record shows the

And when, as here, an evidentiary dispute arises, and when tendering an evidentiary proffer to the court in support of admissibility, "the most important procedural rule is that the proponent of an item of evidence must ordinarily lay the foundation before formally offering the item into evidence." Edward J. Imwinkelreid, Evidentiary Foundations, § 1.02[1] (10th ed. March 2018). "At a bare minimum, the requisite foundation demands something more than intuitive judgments emanating from broad generalities." Gomez, 344 F.3d at 117; see also Kissinger v. Lofgren, 836 F.2d 678, 683 (1st Cir. 1988) (explaining that a proper foundation for evidence requires its proponent to provide "'evidence sufficient to support a finding' that the evidence is what the proponent claims it to be" (quoting 5 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 901(a))); Fed. R. Evid. 104(b).

Important here, building a proper evidentiary foundation involves demonstrating the relevance of the proffered evidence. See Fed. R. Evid. 401 (providing that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action"); Fed. R. Evid. 402

---

district court grappling with the totality of the idiosyncratic situation, wrestling with logistics (Martínez was the only possible defense witness; there was no one else to call to talk about her foot) and the customary, gateway questions swirling around foundation.

(relevant evidence is admissible). "In general, with respect to an item of real evidence, a foundation must be presented establishing that the item is relevant, its identity, and that its condition has not materially changed." Test for Relevant Evidence, Courtroom Handbook on Federal Evidence, Ch. 5 Rule 401 (2023). "With respect to an item used demonstratively or illustratively, the foundation must establish that the item depicts relevant information that is or will be proven by other, substantive evidence; that it is accurate; and that it will probably aid the trier of fact in understanding the evidence." Id. And relevance must be "determined in the context of the facts and arguments in a particular case." Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 387 (2008); see also Advisory Committee's Notes on Fed. R. Evid. 401, 28 U.S.C. App., p. 864 ("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved?").

So, what would the relevance of Martínez's in-court foot display be? Her suggestion, recall, is that her in-court display would tend to rebut what she characterizes as the government's suggestion that it is her foot in Exhibit 88, making her in-court display relevant inasmuch as it could tend to disprove her knowledge, presence, and participation in the scheme. To do this,

though, she needed to foundationally connect these evidentiary dots -- and she did not.

We explain, starting with Exhibit 88 itself. To admit this picture (showing cocaine bundles with crown stickers and $100-bill stickers affixed to them) into evidence, the government called the special agent who conducted the extraction that led to the discovery of the photograph on Martínez's phone. As pertinent here, when the government showed Exhibit 88 to the agent, he testified that he recognized it because the "image [was] part of the extraction that [he] performed of the phone." After Exhibit 88 was admitted, the government continued:

> [Government]: So this was an image that you found, correct, on this phone?
>
> [Agent]: Correct.
>
> [Government]: And this phone belonged to [Martínez].
>
> [Agent]: Correct.

In response to the government's further questioning, the agent testified as to Exhibit 88-1, "the report performed of the telephone extraction." As the agent confirmed, the report captures information about Exhibit 88. Looking at the extraction and metadata report, the agent explained (in some technical detail not necessary to get into here) that the photo (Exhibit 88) was taken on November 4, 2017 at 9:49 p.m. using Martínez's phone. Over an

objection unrelated to any issue on appeal, Exhibit 88 was admitted in full.

The next day, Resto was questioned by the government about the process he and his crew undertook when packaging their kilos. Resto was asked whether the wrapping pictured in Exhibit 88 (which was on display for this line of questioning) was what was done to the kilos of cocaine he and his partners would transport, and he confirmed, "That is correct[, t]his is how they [were] received" and then wrapped by his team.

Having studied the record and the Exhibit 88-related exchanges closely, we agree with the government that in her efforts to convince the court to permit the in-court display of her foot (and still before us), Martínez mischaracterized the government's use of and reliance on its Exhibit 88 at trial. The record reflects that Exhibit 88 was not introduced by the government for the purpose of identifying Martínez or to intimate that the blurry shape at the bottom of the photo is Martínez's foot. Rather, the significance of Exhibit 88, as the government set forth in the foundation it laid for admissibility, was in its timing and what it showed: A November 4, 2017 photo on Martínez's phone, aligning with the Black Wolfpack's November 4, 2017 trafficking journey, showing cocaine bundles with stickers that matched those appearing on bundles seized after the January 2018 arrests. The fact that

a foot might be in the photo was of no moment to the government's case.

Thus, the significance of the display of Martínez's foot -- whether exhibiting her foot directly to the jury, putting it on the court's projector, or taking a screenshot so the jury could get a good look at it -- to permit the jury to contrast it with "the foot" in Exhibit 88 rested on a faulty relevancy premise to begin with. Martínez has not shown how her proposed foot evidence (a) has any tendency to make a fact of import here more or less probable than it would be without the evidence, and (b) why the foot evidence is of consequence in determining some action of consequence to the government's case or to her defense.[26] See Fed. R. Evid. 401 (providing that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in

---

[26] Nothing in Martínez's briefing reasonably explains how her proposed foot evidence implicates her knowledge or any other rational theory of defense. For instance, if the jury made a determination that "the foot" in Exhibit 88 was not her foot, she doesn't explicate why such a finding would somehow demonstrate her ignorance of the drug smuggling activity on January 27, 2018. See, e.g., United States v. Andino-Morales, 73 F.4th 24, 42 (1st Cir. 2023) (citing Zannino, 895 F.2d at 17); Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 313 (1st Cir. 2019) (noting that "developing a sustained argument out of . . . legal precedents is a litigant's job, not ours" (internal quotations and citation omitted)).

determining the action"); Fed. R. Evid. 402 (relevant evidence is admissible).[27]

Indeed, on the record before us and bearing in mind the above-recapped guiding principles of relevancy, we do not see -- and Martínez has not shown -- why a direct-evidence-showing of her foot would be relevant.[28]  Accordingly, we cannot say it was an abuse of discretion to exclude the display of Martínez's foot.

### Jury Instructions

Martínez's third and final appellate argument is of the instructional variety, and it has two dimensions:  The district court committed error when it failed to instruct the jury to consider the charges against Martínez and Andino separately, and in the instructions it did issue, it impermissibly and repeatedly referred to the defendants as a single unit.  We begin our inspection of this assertion by setting the instructional scene, then we'll drill down on these arguments.

---

[27] And, moreover, absent her testimony, Martínez offered no avenue for adducing that her foot, as it would have appeared that day at trial in 2019, resembled or was similar to how her foot would have looked on or around the date that picture was taken in 2017 -- a piece of the foundational puzzle.

[28] And at any rate, other evidence supported the government's position that Martínez was a knowing member of this conspiracy: Resto's testimony (regarding recruiting and working with her, for instance); her own text-message statements -- on dates when the Black Wolfpack was in St. Thomas -- about working and being rich while "not in PR"; and a picture of some bricks taken by her phone while in St. Thomas.  And recall, Martínez does not mount a sufficiency-of-the-evidence challenge on appeal.

In the lead-up to trial, the district court issued an order directing the parties to submit proposed jury instructions. The government filed proposed instructions; neither Martínez nor Andino followed suit. In time, the district court gave counsel its proposed jury instructions and verdict forms for their review, some changes were made during the charging conference, the instructions were redistributed to all counsel at the end of trial day seven, and then, at the close of evidence, the district court read the instructions to the jury.

Throughout the instructions, the district court referred to Martínez and Andino as "the defendants," and "they," "their," and "them," too. One example of many such instances came when the district court instructed the jury that, "Even if the Defendants were not part of the agreement at the very start, they can be found guilty of conspiracy if the Government proves that they willfully joined the agreement later." This phrasing occurs throughout the instructions. Later, the district court did instruct that the jury could not "find the Defendants guilty unless [the jury found] beyond a reasonable doubt that each of them participated in the conspiracies as charged with at least one other person, whether a Defendant or not." Additionally, each defendant had her own verdict form. The district court separately identified each form ("There are two verdict forms; one for each Defendant.") and read each form to the jury. Martínez's verdict form directed the jury

to determine whether Martínez was guilty or not guilty for conspiring to possess with the intent to distribute and import cocaine, and did not mention Andino; Andino's form communicated the same directive, likewise never mentioning Martínez.

Debuting her concerns about the instructional phase, Martínez focuses on two aspects of what happened during the jury charge. First, she says the district court failed to issue an instruction to the jury directing it to consider each defendant separately and not think of them as a group. Second, she argues the district court's consistent and repeated reference to the defendants as a unit constituted prejudicial error because there was more extensive evidence against Andino than Martínez. Indeed, Martínez urges that the district court's error was not putting the terms "each of" before every mention of "the defendants" throughout, instead doing so only once -- that "each of them participated in the conspiracies" line we mentioned -- and even that was against the backdrop of many more instructions that group them together as one entity. And Martínez further argues the separate jury verdict forms shouldn't impact our calculus at all since they are not instructions, but rather are a mere end-of-the-process formality that could not undo the damage that had already been done during the instructional phase.

For its part, the government disagrees entirely, maintaining that a whole-picture view of the jury charge plainly

demonstrates the jury was told to consider Martínez and Andino separately to determine guilt as to each individual woman.

Martínez correctly owns that there was no objection to the final instructions below, which contain the offending language she now protests on appeal.  Given this concession, and assuming, contrary to the government's assertion, the argument is not waived, see United States v. Clough, 978 F.3d 810, 823 (1st Cir. 2020) ("We need not linger over [appellant's] contentions because he waived this claim by failing to request such an instruction below."), our review of these contentions is, at best, for plain error,[29] see United States v. Cruz-Ramos, 987 F.3d 27, 39 (1st Cir. 2021) (explaining that an appellant "must run the usually lethal gauntlet of plain-error review" on his instructional-error claim when he did not raise the issue below).  This requires Martínez to "make the difficult showing that the judge erred and clearly [or obviously] so, and that the error also affected [her] substantial rights -- but even then we can still affirm if [she] does not show as well that the error seriously harmed the fairness, integrity, or public perception of [her] trial." Id.; see also United States v. Bauzo-Santiago, 867 F.3d 13, 22-23 & 23 n.8 (1st Cir. 2017). "This standard is exceedingly difficult to satisfy in jury

---

[29] When a party fails to object to a jury instruction, Federal Rules of Criminal Procedure, Rule 30(d) "precludes appellate review" except for plain error.

instruction cases:  '[T]he plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors.'"  United States v. González-Vélez, 466 F.3d 27, 35 (1st Cir. 2006) (quoting United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001)).

       "When applying the plain error standard in the context of jury instructions, [this court] look[s] at the instructions as a whole to ascertain the extent to which they adequately explain the law without confusing or misleading the jury." Bauzo-Santiago, 867 F.3d at 23 (quoting United States v. Candelario-Santana, 834 F.3d 8, 27 (1st Cir. 2016)) (cleaned up); see also United States v. Padilla-Galarza, 990 F.3d 60, 83-84 (1st Cir. 2021) (observing that this review of jury instructions "is context-dependent and must take into account the jury instructions as a whole"); United States v. Vega, 813 F.3d 386, 396-97 (1st Cir. 2016) (concluding on plain-error review that, "read[] against the backdrop of the charge as a whole," the jury instructions were sufficient, even if not "letter perfect" (quoting Paniagua-Ramos, 251 F.3d at 246-47)).  Given all of this, we've said this lens of review "is cold comfort to most defendants pursuing claims of instructional error." Mitchell, 596 F.3d at 25 (quoting United States v. Gómez, 255 F.3d 31, 37 (1st Cir. 2001)).

       The stage set, we proceed to our plain-error review, mindful that "a reversal on instruction-error grounds is 'a remedy

that is granted sparingly.'" United States v. Takesian, 945 F.3d
553, 566 (1st Cir. 2019) (quoting United States v. Gelin, 712 F.3d
612, 620 (1st Cir. 2013)).  We won't hide the ball:  Martínez's
instructional-error arguments cannot withstand the "exceedingly
difficult to satisfy" plain-error scrutiny, González-Vélez, 466
F.3d at 35, and that is because we discern no clear or obvious
error.

        Martínez says the district court should have included an
(unrequested) instruction that the jury consider the defendants
separately, and its failure to do so -- coupled with its repeated
lumping together of "the defendants" during the jury charge -- is
an error that was plain.  But in looking at these arguments
"against the backdrop of the charge as a whole," Vega, 813 F.3d at
396-97 (quoting Paniagua-Ramos, 251 F.3d at 246-47), it's clear
they were sufficient and no clear or obvious error lies.

        True, the district court did not say "each defendant" or
place "each of" before "the defendants" throughout the jury charge.
But these standard instructions, again, read in context and as a
whole, had the effect of appropriately directing the jury to
consider Martínez and Andino separately.  Early in the
instructions, setting the stage and tone, the district court told
the jury that (emphasis ours)

        [t]he presumption of innocence alone may be sufficient
        to raise a reasonable doubt and to require the acquittal
        of a Defendant.  The Defendants before you, Katerin

> Martínez-Alberto and Alexandria Andino-Rodríguez, have
> had the benefit of the presumption of innocence
> throughout the trial and you are not to convict them of
> the charges against them unless you are persuaded of
> their guilt of these charges beyond a reasonable doubt.

Later, the district court was clear that the jury could not "find

the Defendants guilty unless [it found] beyond a reasonable doubt

that each of them participated in the conspiracies as charged with

at least one other person . . . ." (Emphasis added.) We also

note that the jury had before it the defendants' indictment -- the

charging document that spells out the counts against each defendant

-- which the district court referenced throughout its instructions

and gave to the jury (the government having redacted Maximiliano

and Emiliano from it) for its use during deliberations. Add to

that (as the government points out) the separate jury verdict forms

canvassed thoroughly during the jury charge. Remember, the

district court told the jury, "There are two verdict forms; one

for each Defendant," then walked through each form for the jury's

benefit, with Martínez's verdict form being entirely unique to her

and the charges against her, never mentioning Andino, who had her

own jury verdict form.[30] And as for Martínez's assertion that any

---

[30] For example, the district court read into the record:

[A]s to Ms. Martínez-Alberto, the verdict reads as
follows:

"As to the charge in Count One of the indictment,
conspiring to possess with intent to distribute cocaine,
we, the jury, unanimously find the Defendant, Katerin

consideration of an extraneous document like a jury verdict form should not be part of our decisional calculus, we believe the district court's careful review of the purpose and operation of the forms would have clarified any possible ambiguity in the jurors' minds about their decision-making responsibilities towards each defendant.

And despite Martínez's protestations to the contrary, our case law does not favor her position given our standard of review here.  We've described a plain (i.e., clear or obvious) error as being one that is "'indisputable' in light of controlling law."  United States v. Rabb, 5 F.4th 95, 101 (1st Cir. 2021) (quoting United States v. Jones, 748 F.3d 64, 70 (1st Cir. 2014)).  While some of the cases to which Martínez points flag steps that may be taken during the jury charge to dispel the risk of prejudice, like issuing an instruction that the jury give separate

---

Martínez-Alberto," and then there is a place for you to check "guilty" or "not guilty".

And as to the charge in Count Two of the indictment, "Conspiring to import cocaine into the customs territory of the United States from a place outside the customs territory of the United States, but within the United States, we, the jury unanimously find the Defendant Katerin Martínez-Alberto," and again, you have a place to check "guilty" or "not guilty".

. . .

There is a place for the jury foreperson to sign and date the verdict.

The district court then did the same with Andino's verdict form.

consideration to each defendant, we are unaware of any controlling law that affirmatively obligates courts to issue this specific instruction in order to avoid committing clear and obvious error. And when, as here, a full-picture review of the instructional phase shows the jury was sufficiently clear on its task to consider the defendants and the evidence against each separately, there is no indispensable need for such a requirement.[31]

In all, in view of our context-dependent reviewing parameters, Martínez has not shown plain error. See, e.g., Padilla-Galarza, 990 F.3d at 83-84; Bauzo-Santiago, 867 F.3d at 23; Vega, 813 F.3d at 396-97.

---

[31] Were Martínez's jury instruction challenge preserved (thereby triggering a more appellant-friendly standard of review), this might have been a closer call. As we've said, when it comes to jury instructions in multi-defendant trials, the best practice is for district courts to take care to instruct in the clearest possible terms as to each individual defendant -- one way to do so is to proactively issue instructions to avoid the spillover prejudice Martínez is concerned about here. See, e.g., United States v. Simon, 12 F.4th 1, 44 (1st Cir. 2021) (relying on the district court's "prudent[]" instruction to the jury "to treat each defendant individually and to weigh separately the evidence as to each defendant" to combat the risk of prejudice), cert. denied sub nom. Kapoor v. United States, 142 S. Ct. 2811 (2022), and cert. denied sub nom. Lee v. United States, 142 S. Ct. 2812 (2022); González-Vélez, 466 F.3d at 35-36 (relying in part on the district court having "explicitly stat[ed] that, '[T]he evidence pertaining to each defendant should be considered separately and individually'" to conclude "the instructions did not constitute error as to the finding of guilt").

### **Andino**

We come now to Andino and the sole issue she raises on appeal, a sentencing challenge. Andino says the district court committed reversible error when it denied her request for a mitigating role adjustment pursuant to the federal sentencing guidelines, and that error resulted in the improper calculation of her guidelines sentencing range. Having carefully reviewed the sentencing record, we are unconvinced. Before we explain why that is so, we offer a little contextual primer on the sentencing framework in which Andino's appellate contention operates and the lens through which we must review it.

Andino's sentencing challenge is based upon the guidelines' available downward adjustments for a defendant who played a mitigating role in an offense. Specifically, section 3B1.2 of the guidelines allows a court to decrease a defendant's offense level by four levels if she is deemed a minimal participant, two levels if she is deemed a minor participant, and three levels if the case falls somewhere in between. See U.S.S.G. § 3B1.2; see also United States v. De la Cruz-Gutiérrez, 881 F.3d 221, 225 (1st Cir. 2018) (tracking some of the evolution of this reduction). "Adjustments under this section apply to defendants whose role in the offense make them 'substantially less culpable than the average participant in the criminal activity.'" United States v. Mendoza-Maisonet, 962 F.3d 1, 23 (1st Cir. 2020) (quoting

U.S.S.G. § 3B1.2 cmt. n.3(A)).  A defendant "who [is] plainly among the least culpable of those involved in the conduct of a group" is considered a minimal participant.  U.S.S.G. § 3B1.2 cmt. n.4. Alternatively, a minor participant is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."  Id. cmt. n.5.

Now, our method of review for Andino's mitigating-role argument.  Zooming out for the basics, we review procedural reasonableness challenges like Andino's "under a multifaceted abuse-of-discretion standard whereby we afford de novo review to the sentencing court's interpretation and application of the sentencing guidelines, assay the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion." Mendoza-Maisonet, 962 F.3d at 20 (quoting United States v. Arsenault, 833 F.3d 24, 28 (1st Cir. 2016)).

Narrowing our focus to the sort of mitigating role adjustment issue we're confronted with in this case, we emphasize that "[t]he defendant seeking the mitigating role adjustment 'bears the burden of proving, by a preponderance of the evidence, that [she] is entitled to the downward adjustment.'"  Id. at 23 (quoting United States v. Arias-Mercedes, 901 F.3d 1, 5 (1st Cir. 2018)).  We've often warned that, "[b]ecause determining one's role in an offense is a fact-specific inquiry, 'we rarely reverse a district court's decision regarding whether to apply a minor

role adjustment.'"  De la Cruz-Gutiérrez, 881 F.3d at 225-26
(quoting United States v. Bravo, 489 F.3d 1, 11 (1st Cir. 2007));
see also United States v. Valenzuela, 849 F.3d 477, 489 (1st Cir.
2017) (reviewing the district court's decision to impose a minor
participant reduction for clear error because "[r]ole-in-the-
offense determinations are notoriously fact-sensitive" (quoting
United States v. Montes-Fosse, 824 F.3d 168, 172 (1st Cir. 2016)));
United States v. Pérez, 819 F.3d 541, 546 (1st Cir. 2016)
("[B]attles over a defendant's status . . . will almost always be
won or lost in the district court." (second alteration in
original)).  Indeed, "[a] defendant will 'only prevail on appeal
by demonstrating that the district court's determination as to his
role in the offense was clearly erroneous.'"  De la Cruz-Gutiérrez,
881 F.3d at 226 (quoting United States v. González-Soberal, 109
F.3d 64, 74 (1st Cir. 1997)).  And our "clear-error standard is
demanding and will be satisfied 'only if, upon whole-record review,
an inquiring court forms a strong, unyielding belief that a mistake
has been made.'"  Mendoza-Maisonet, 962 F.3d at 20 (quoting United
States v. Montañez-Quiñones, 911 F.3d 59, 66 (1st Cir. 2018))
(cleaned up).  What's more, if the record supports at least two
plausible inferences, the district court's choice among these

alternatives cannot be clearly erroneous.  <u>See</u> <u>De la Cruz-Gutiérrez</u>, 881 F.3d at 227.[32]

All of this to say, "the standard is highly deferential, and reversal is rare." <u>United States</u> v. <u>Ruiz</u>, 999 F.3d 742, 750 (1st Cir. 2021) (citing <u>Mendoza-Maisonet</u>, 962 F.3d at 23).

With this guidance in tow, we turn to the opposing views presented at the presentencing regarding Andino's role in the trafficking operation.  After the trial concluded and before the sentencing hearing, a probation officer produced Andino's presentence report ("PSR").  The report came up with an initial offense level of 36 pursuant to U.S.S.G. § 2D1.1(a) and the application of a two-level reduction according to the safety valve criteria under U.S.S.G. § 5C1.2, cmt. n.2.[33]  The probation officer posited that "Ms. Andino is entitled to a mitigating role

---

[32] <u>See also</u> U.S.S.G. Notes:  "The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case."

[33] The safety valve provision limits the application of mandatory minimum sentences for certain drug offenders who qualify under a list of factors included in 18 U.S.C. § 3553(f).  <u>See also</u> U.S.S.G. § 5C1.2.  We have found "Congress's purpose in enacting the provision was to 'mitigate the harsh effect of mandatory minimum sentences' on first-time, low-level offenders in drug trafficking schemes." <u>United States</u> v. <u>Padilla-Colón</u>, 578 F.3d 23, 30 (1st Cir. 2009) (citing <u>United States</u> v. <u>Ortiz-Santiago</u>, 211 F.3d 146, 150 (1st Cir. 2000)); <u>see</u> H.R. Rep. No. 103-460 (1994).  After Andino's safety valve interview, the government determined she satisfied the statutory requirements and therefore agreed to the application of this two-level adjustment.

adjustment" and thus reduced her base offense level by three levels (meaning she was less culpable than other participants in the offense but had more than a minimal role) and then reduced it an additional two levels for being a minor participant.

The government objected to the probation officer's application of the two mitigating role adjustments, however the probation officer stood by his initial determination, stating Andino's role in the offense "seems to be small when compared to that of some of her co-conspirators within the overall drug importation scheme."  The probation officer did not dispute the events (being present in meetings, signing marina forms, helping wrap and clean the kilos), but argued a closer look at those activities reveals the role of a minor participant.  Andino's sentencing memorandum adopted the probation officer's reasoning, and in turn proposed to the district court an 87-month sentence, the lower bound of the sentencing range once adjusted for the safety valve and both mitigating role adjustments.

In its ensuing formal objection, the government applied the five-factor assessment listed in section 3B1.2 cmt. n.3 (C) to the facts of Andino's case,[34] concluding from this exercise that

---

[34] These five non-exhaustive factors are:  (i) the degree to which the defendant understood the scope of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing; (iii) the degree to which the defendant exercised decision-making authority; (iv) the nature and extent of the

Andino was no mere mule or smokescreen within the trafficking enterprise. Based on this telling of the story, the government asked for 120 months' imprisonment.

With this point of contention looming, the parties headed into the sentencing hearing. Once there, the district court, after considering arguments from both sides, disagreed with the probation officer and Andino's position, ultimately finding Andino ineligible for any mitigating role adjustment. To justify its decision, the court went through the five mitigating role adjustment factors (see supra note 34) and matched Andino's conduct to each factor. The district court noted Andino had sailed to St. Thomas on several occasions, well aware of her role as a "filler" to cover up the true nature of the voyage. Prior to at least one trip to St. Thomas, Andino met at Coplin's home to coordinate and plan the next criminal venture. Andino's role while in St. Thomas -- registering the Black Wolfpack at the Crown Bay Marina and assisting in the packaging of several kilos of cocaine -- demonstrated her willing participation in the commission of the crime. And lastly, as the final factor, the district court observed that Andino received $7,000 for her participation in a single trip from which the court inferred Andino stood to benefit from the criminal activity.

---

defendant's participation; and (v) the degree to which the defendant stood to benefit. See U.S.S.G. § 3B1.2, cmt. n.3 (C).

With all the facts on the table, the district court concluded Andino did not play a minor role in the operations of the Black Wolfpack and denied the mitigating role adjustments she requested.  From there, the court landed on a total offense level of 34, which, when bundled with her criminal history category of I, yielded a guideline range of 151-188 months.  After noting that range was greater than necessary to achieve the goals of sentencing and, consequently, adding a downward variance, the district court's tabulations concluded with the pronouncement of a 120-month sentence of imprisonment and a five-year term of supervised release.

Now we assess whether the district court clearly erred in its decision to deny Andino this adjustment.  Remember, Andino had the burden of proving her entitlement to the requested adjustment, Mendoza-Maisonet, 962 F.3d at 23, and we defer to the district court's factual determinations as to whether she carried that burden unless we form "a strong, unyielding belief that a mistake has been made," id. at 20 (quoting Montañez-Quiñones, 911 F.3d at 66).  Viewed under this exacting lens, we spy no such mistake and conclude Andino's sentencing claim must fail.

Andino's arguments in support of her overall sentencing challenge share intertwined theses and themes:  She carried her burden of showing she was an inessential "smokescreen" who played a tiny, non-leadership role in the trafficking scheme and was thus

far less blameworthy than most of her smuggling cohorts, and the district court committed error in ignoring some evidence and misconstruing other evidence to reach the opposite conclusion.  We tease all of this out as we go.

Let's start with Andino's argument that the court's denial of her requested adjustment was clearly erroneous[35] because "she was less culpable than most codefendants; the only exception being codefendant . . . Martínez-Alberto."

For starters, our case law is clear that all parties engaged in a criminal enterprise can be "located on a continuum." Arias-Mercedes, 901 F.3d at 8.  Those who are primarily responsible stand on one end, and the least culpable participants, described here as being Martínez, stand at the opposite end.   When a defendant "stands somewhere in the middle," as Andino seems to concede is where she falls on this continuum, a district court may reasonably infer the defendant is "not substantially less culpable than the average participant."  Id.  This fundamentally undercuts much of her argument.

Another problem with this asseveration is that it asks us to simply take a different view of the same facts that were

---

[35] A quick aside to acknowledge the possibility that Andino's counsel conceded at argument before us that there was no clear error in the district court's findings.  But because it's not entirely clear and it's similarly unclear how sweeping the concession would be, we'll proceed to our analysis.

before the district court to reach Andino's preferred outcome.[36]
This is not a winning approach.  See Pérez, 819 F.3d 546
(dismissing appellant's arguments based on the same facts
considered by the district court); Mendoza-Maisonet, 962 F.3d at
24 (rejecting appellant's argument that the district court failed
to accurately interpret the facts within the record).  And despite
Andino's disagreement with the inferences drawn by the district
court, when "the record supports at least two permissible
inferences, 'the sentencing court's choice among supportable
alternatives cannot be clearly erroneous.'"  De la Cruz-Gutiérrez,

---

[36] And another quick aside on the topic of what, exactly, was
before the district court with respect to Andino because, in her
papers and at oral argument, Andino devoted some attention to her
safety valve interview and the role she thinks it should have
played in sentencing.   In her interview, Andino provided
information about her knowledge and participation in the criminal
enterprise.  She says this was presented at sentencing and should
have been considered by the court in determining her role in the
offense.
    Here's the thing.  When the district court clearly stated it
would not use this information, opting instead to "strictly
determine her role in the offense based on what was testified at
trial," Andino did not object.  That means our review of this
question is for plain error.  See United States v. Pupo, 995 F.3d
23, 29 (1st Cir. 2021).  But Andino failed to cite any case law
that requires district courts to consider safety valve interviews
or explain how the information produced in her interview would
help her case.  Truth be told, she made no mention of the plain-
error review this aspect of her argument was up against, let alone
attempt to meet the onerous four-part burden.  For these reasons,
this aspect of Andino's argument is waived.  See Cruz-Ramos, 987
F.3d at 40 (collecting examples of waiver arising when appellants
fail to attempt to meet the demanding burden of plain-error
review).

881 F.3d at 227 (quoting Pérez, 819 F.3d at 546).  That is what we
have here.

    Next consider Andino's supposition that because other
co-defendants had greater organizing roles, the court erroneously
inferred she took part in planning the crime based on testimony
placing Andino at a meeting to plan an operation.  Not so.  Instead,
when the district court considered these facts, it reasonably
viewed Andino's presence at the meeting as evidence
"establish[ing] that Ms. Andino possessed some degree of decision-
making authority or that she was sufficiently trusted to be part
of the coordination efforts."  Similarly, Andino argues the $7,000
payout for her role in the operation was insignificant considering
other participants received over $20,000.  When the district court
considered testimony stating Andino received thousands of dollars
for her efforts and $7,000 for a single trip, it inferred "the
financial benefits for participating in the criminal activity were
significant."  We are left with two sides of the same story, and
no reason to find the district court clearly erred in determining
she hadn't carried her burden -- "the fact that someone else might
have been more culpable than [Andino] does not necessarily mean
that [Andino's] participation was minor [or minimal]."  De la Cruz-
Gutiérrez, 881 F.3d at 226 (third alteration in original); see
also Mendoza-Maisonet, 962 F.3d at 24-25.

Then there's Andino's argument that the district court relied too heavily upon the government's position, did not consider the arguments made by the probation officer, and failed to support its decision for denying Andino's adjustment with evidence in the record. Andino bases this claim on the addendum to the PSR where the probation officer stood by and doubled down on his determination that Andino was deserving of a minor role. But despite Andino's insistence that "the sentencing [c]ourt did not consider them and ultimately sided with the government's version of the facts," the court made clear it had reviewed the parties' submissions (including the defense's sentencing memorandum, which relies upon the probation officer's reasoning in the addendum to the PSR) and went on to reference the probation officer's perspective throughout the sentencing hearing. Notably, the district court concluded that the "probation officer did not correctly apply the guideline computations, and the pre-sentence investigation report does not reflect the components of Ms. Andino's offenses, or consider their nature and circumstances." In other words, and contrary to Andino's argument otherwise, the court considered both the probation officer's and the government's views before making a "choice among supportable alternatives," and we "cannot [find this] clearly erroneous." De la Cruz-Gutiérrez, 881 F.3d at 227 (quoting Pérez, 819 F.3d at 546); see also Mendoza-Maisonet, 962 F.3d at 24 (acknowledging the district court hadn't

explained its decision to deny a minimal participation reduction,
but "infer[ring] that it sided with the [g]overnment's arguments
and therefore decided not to apply the reduction").

And Andino also invokes the guidelines' commentaries,
alleging that the district court's failure to follow these
commentaries amounted to an incorrect application of the
guidelines. See, e.g., United States v. Carrasco-Mateo, 389 F.3d
239, 243-44 (1st Cir. 2004) ("The Sentencing Commission's
commentary, including the application notes, is binding on the
courts as long as it does not conflict either with the sentencing
guidelines themselves or with some statutory provision."). Like
the arguments that came before it, this one also fails to move the
needle. Section 3B1.2, cmt. n.3 (C) establishes the now familiar
non-exhaustive list of factors, but also informs us that a
defendant "who is simply being paid to perform certain tasks should
be considered for an adjustment under this guideline," and an
adjustment remains a possibility even for a defendant who "performs
an essential or indispensable role in the criminal activity."
However, we've observed that "[t]he commentary does not indicate
that every such offender is entitled to a mitigating role
adjustment; it merely instructs that every such offender 'should
be considered for a mitigating role adjustment.'" Arias-Mercedes,
901 F.3d at 9 (quoting U.S.S.G. App. C, Amend. 794). While
Andino's circumstances could be found to meet this commentary's

parameters, the record shows that the district court considered Andino's role in the offense and found it undeserving of a mitigating role adjustment. And when, as we've observed, someone participates "in a hazardous voyage at sea" to move a significant volume of drugs, "it ordinarily will not be clear error for the sentencing court to refuse [her] a mitigating role adjustment." Id. at 8 (citing Pérez, 819 F.3d at 546). This is an example of that ordinary no-clear-error case.

And so, seeing no clear error in the district court's determination that Andino did not carry her burden to demonstrate she was entitled to the downward adjustment she sought, we affirm here as well.

## CONCLUSION

Having reasoned through all of the issues leading to the across-the-board affirmance we previewed at the outset, we now make it official: Based on the foregoing, we affirm.

- 60 -